Marie Agnes CLARKE, Executrix of the
Estate of William A. Peak, Appellant,

v.

WARD BAKING COMPANY, a corporation,
Appellee.

No. 3186.

District of Columbia Court of Appeals.

Argued April 29, 1963.

Decided June 5, 1963.

As Modified June 24, 1963.

Martin F. O'Donoghue, Jr., Washington, D. C., with whom Patrick C. O'Donoghue, Washington, D. C., was on the brief, for appellant.

Winthrop A. Johns, Washington, D. C., with whom Gerald D. Reilly, Washington, D. C., was on the brief, for appellee.

Before QUINN and MYERS, Associate Judges, and CAYTON (Chief Judge, Retired).

CAYTON, Acting Judge.

William A. Peak sued his employer, Ward Baking Company, for breach of contract, charging that it had failed to pay him commissions due for sales and deliveries made on his route. The trial court ruled that he had failed to prove his case and ordered judgment for defendant. This appeal followed, and plaintiff having died, his executrix was substituted as appellant.

As the facts are somewhat complicated an identification of the principals involved will be helpful. Ward Baking Company is a producer and distributor of baked goods, including bread and cakes. Peak was employed as a driver-salesman at Ward's Hyattsville agency and was a member of Bakery and Sales Drivers Union Local 33, IBT, which represents the driver-salesmen employed there. Peak's delivery and sales route covered a large area of the District of Columbia and Embassy Dairy is located within the geographical area of Peak's route.

Ward produces all its baked goods at its bakery in Baltimore, Maryland. Distribution is made throughout the Washington metropolitan area by driver-salesmen from its Hyattsville agency. The baked goods are delivered to Hyattsville from Baltimore by transport truck. In Hyattsville they are "racked up" onto individual driver-salesmen's trucks for distribution. All of the geographical area of the District and some of the surrounding area is serviced by driver-salesmen working out of the Hyattsville agency.

Ward and the union entered into a collective bargaining agreement effective May 1, 1961, thru April 30, 1962. The pertinent provisions are as follows:

"SECTION 1. A. The Employer agrees to recognize the Union as the sole collective bargaining agent for the employees covered by this Agreement, namely, all who are engaged in the delivery, sale and shipping of the Employer's products.

\* \* \* \* \* \*

"SECTION 3. A. *That all trade requiring daily service shall be served*

*only by the regular sales driver and/or swing man upon whose route such trade naturally belongs,* except occasional emergency deliveries. (Special deliveries may supplement routes on Saturdays and eves of full holidays only.) This includes company owned, company leased, or company operated wholesale and retail outlets.

"B. *All bakery goods called for at the bakery or delivered by the bakery* to be disposed of by or through or at outlets such as grocery stores, drug store fountains or lunch counters, restaurants (chain or individually owned), hotels, *institutions, etc., shall be charged to the sales driver upon whose route each outlet unit naturally belongs, who shall be compensated for same* at rate of pay, commissions and terms as set forth in Section 4.

"C. *When bakery goods are delivered on any route, the sales driver on whose route such goods are delivered shall receive the regular commission on same.* This includes Sundays and holidays on which deliveries are not made by regular route sales drivers. No special deliveries to stores shall leave the bakeries before 7:00 A.M." (Emphasis supplied.)

In August, 1961, Ward began making bread deliveries to Embassy Dairy direct from its bakery in Baltimore. Such deliveries were made by the same transport truck used to deliver goods from Baltimore to Hyattsville. The driver would first stop at Embassy, make a delivery, and then .proceed to Hyattsville to make deliveries there. Peak claimed that under the contract language above quoted, he was. entitled to commissions on the bread sold to Embassy.

(Section 4 of the collective bargaining agreement provides that driver-salesmen are to receive 10% on all sales or deliveries on their routes over $400 each week. It was stipulated at trial, and also at argument in this court, that the total sales to Embassy for the period covered by the complaint was $24,568.72. Ten percent of this figure therefore represented the amount of plaintiff's claim.)

· A lengthy trial was had and later the trial court in a memorandum opinion held that Peak had failed to carry his burden of proving that the collective bargaining agreement applied to him or that he was entitled to commissions on the bread delivered by Ward to Embassy.

■■■ Although a collective bargaining agreement is not a contract of employment, whoever accepts or continues employment after it becomes effective is bound by its conditions and terms [1] and becomes entitled to its benefits. The same rules of construction are applied as in contract law generally,[2] and by the general rule an individual may bring suit for breach of its provisions.[3]

The evidence showed that Peak's route covered sections of northwest and northeast Washington; that routes assigned to the various driver-salesmen have boundaries and that one salesman would not make sales in an adjoining territory; that at one time a large Rand-McNally map of the Washington metropolitan area was hung on the wall of the Hyattsville agency, with pins representing each stop served by a driver-salesman; that a string was placed around the stops served by each sales driver and his route number placed within the circumscribed area.

Testimony by Ward's sales supervisor in Hyattsville was that no other driver-salesman serviced stops in Peak's territory; that

---

1. Annot., 95 A.L.R. 10, 40.

2. Reichert v. Quindazzi, N.Y.C.Mun.Ct., 6 N.Y.S.2d 284.

3. MacKay v. Loew's, Inc., 9th Cir., 182 F.2d 170, 18 A.L.R.2d 348, cert. denied,

340 U.S. 828, 71 S.Ct. 65, 95 L.Ed. 608; Division of Labor L. E. v. Standard C. Prod. Co., 136 Cal.App.2d 919, 288 P.2d 637.

Embassy is the only stop serviced from Baltimore; that Embassy is located within the geographical area serviced by Peak; and that new stops are normally given to the closest route man.

It was testified that bread deliveries to Washington were discontinued for economic reasons and that Peak sold and delivered only cake; but there was evidence that if it were economically feasible a driver-salesman such as Peak would carry other bakery products as well.

It is clear from the evidence that a Ward sales driver is not a mere delivery man but is expected to sell and promote the company's products. Familiarity with customer needs is valuable as he normally would need to know the quantity of goods to place at each stop. He attempts to obtain a more advantageous marketing position for his products, works on a salary plus commission basis and makes the collections from his customers.

It is significant that this is the first occasion on which the company has assigned to Baltimore a stop within the area serviced by the Hyattsville agency. It is also significant that this is the first time the company has taken a stop out of a geographical area assigned to and covered by a driver-salesman, and made direct deliveries from the bakery. And Embassy is apparently the first customer of its nature to be serviced by Ward. The bread is baked for Embassy under a special formula and packaged in an Embassy wrapper. Approximately 6,000 loaves are delivered to Embassy each week, deliveries being made at midnight, as required by Embassy, 6 nights a week including Sunday. Embassy makes no sales at the dairy, but retails the bread through its salesmen.

■ The trial court apparently found, and appellee argues here, that the word "employer" in Section 1. A. of the bargaining agreement refers to the Hyattsville agency and does not cover the Ward Company Baltimore operation. Although

"Ward Baking Co., Hyattsville Agency" is named as employer in the agreement, it is also a fact that the Hyattsville agency is merely a part or adjunct of the Baltimore office. Hyattsville drivers are paid from Baltimore; all baking is done in Baltimore; the books are kept in Baltimore and the sales manager at Hyattsville is under the direct supervision and direction of the manager in Baltimore. Appellant is therefore correct in asserting that the Hyattsville agency is not a separate entity but is nothing more than a part of the Ward Baltimore operation.

■ There was evidence that Embassy had never been assigned to Peak as a stop. Appellee would have us hold that such is a bar to recovery, since it asserts that a route is nothing more than a collection of stops. We think the argument is invalid. Creation of exclusive rights as to time and area is not an unfamiliar practice in commercial transactions generally. And in the field of labor-management relations it is far from infrequent that an employer grants exclusive privileges of one kind or another as an incentive to increased effort and production. That, we think it plain, is what was intended and done in this case.

In establishing each route the company did more than merely lay out a series of delivery stops. Under the bargaining agreement it was creating an exclusive territory within which the particular driver was to operate, promoting and selling the employer's products and becoming entitled to commissions for all sales and deliveries made within his territory. See Snow White Baking Co., 137 NLRB No. 163, July 19, 1962.

Sections 15 and 16 of the bargaining agreement lay down certain practices to be followed in the geographical area of metropolitan D. C. as depicted on the Rand-McNally map. The company had no right to carve out of this area a particular spot, such as Embassy, and to unilaterally determine that such spot is not covered by the agreement, and thereby destroy territorial

exclusivity and defeat the driver's vested right to commissions.

■ Section 3 of the agreement is designed to protect the earnings of driver-salesmen. The language of subparts B and C is broad and inclusive. It prescribes that *"all bakery goods"* called for at the bakery or delivered by the bakery *shall* be charged to the salesman upon whose route such trade naturally belongs, and commissions paid thereon. The language is not confined to "cake," as appellee contends, but specifies *"all bakery goods,"* clearly encompassing bread.

This language also makes it clear, as we have already stated, that the Hyattsville agency cannot be treated as separate and distinct from Ward's Baltimore, for it is admitted that no baking is done in Hyattsville. The trial court could not properly have held that the bargaining agreement did not cover the relationship between Peak or the union, and Ward Baking Co., in Baltimore. To do so would ignore or misinterpret clear and unambiguous contract language.

■ It is true that the company reserved the right to rearrange routes; but Peak's claim is based upon sales made on his route during the time it actually belonged to him. And the fact that Embassy was unlike the majority of Peak's stops in that it did not require the usual duties of sales promotion is likewise no reason to deny recovery. The language of Section 3 is not confined to deliveries to small outlets, but covers deliveries to restaurants, hotels and "institutions, etc.," and is clearly broad enough to cover Embassy.

One of appellant's contentions is that the bargaining agreement created a scope of operation intended to cover all sales and deliveries, and that attempted direct deliveries would deprive employees of "sales," and would constitute "contracting out," in violation of the agreement. This situation does not reveal contracting out in its most usual form—the actual letting of work to outsiders; but the principle is the same, for the company's action amounted to an invasion of sales territory which belonged exclusively to a member of the bargaining unit, thereby depriving him of commissions flowing from such sales.

■ An essential premise of a bargaining agreement is that the employee is to perform certain work; and an employee who abides by the agreement will have his job rights protected.[4] If the company could perform the work which by the agreement is to be performed exclusively by driver-salesmen, it could deplete a major part of the union work force, and this would be inconsistent with the basic purpose of both the recognition clause and Section 3.[5] Those clauses establish job security and the company may not remove specified "work opportunities"—or the pay due therefor—from the members of the bargaining unit.[6] And, as we have already seen, the agreement protects their earnings by including *all* bakery products *called* for at the bakery or *delivered* by the bakery. If sales and deliveries to customers like Embassy were to be exempted from territorial rights of driver-salesmen, such exemption could have been negotiated and written into the agreement. The situation presented in this case reveals no such exemption or exception.

4. Retail Clerks Union Local 770, etc. v. N. L. R. B., 111 U.S.App.D.C. 246, 296 F.2d 368.

5. International U., United Auto., etc. v. Webster Elec. Co., 7th Cir., 299 F.2d 195.

6. See Cooperative Mills, Inc., 20 Labor Arbitration Reports 603; Rock Hill Printing & Finishing Co., 19 Labor Arbitration Reports 467; Adolph Coors Co., 18 Labor Arbitration Reports 156; Union Oil Co. of Calif., 11 Labor Arbitration Reports 94; Owl Drug Co., 10 Labor Arbitration Reports 498.

We have not discussed all the contentions made by appellee; but we have considered them, and we are satisfied there must be a reversal.

Reversed with instructions to enter judgment in favor of appellant for $2,323.52.